Good morning, Your Honors, if it pleases the Court. My name is Deborah Bookout. I represent Christopher Jernigan. I'm going to try and reserve two minutes for rebuttal. Both the Nevada Supreme Court and the District Court found that the prosecutor committed misconduct during Jernigan's trial. So the only issue to be determined here is whether that misconduct had a substantial and injurious effect or influence on the jury's verdict. Because the evidence against Jernigan was, in fact, not overwhelming, the prosecution's conduct did, in fact, have a substantial influence on the jury's verdict. In fact, it appears clear from the record that it was the intent of the prosecutor to taint the jury and to paint as awful a picture of Jernigan's character as he possibly could precisely because the evidence was not strong. From opening statement and with almost every witness and through to closing argument, the prosecutor injected some reference to Jernigan's bad character, from his being a burden to society, an irresponsible and degenerate father unable to raise his own child, to his being a drug user, to his being a drug dealer, to his being a skinhead with swastika tattoos, and finally, with its insistent and repeated references to Jernigan's prior prison and custody status. There are several factors, compelling factors, which highlight the weakness of the State's case. First, there's the timing. The Leonard family advised the police, that was the family that was traveling from Idaho and stopped in Mena, that they arrived in Mena sometime between 2.30 and 3 a.m. They told the police that after checking into room 8, which shared an adjoining door with room 7, which was the victim's room, they heard noises coming from room 7, which sounded like drawers or doors opening and closing. This occurred around 3 a.m., but the testimony showed that Jernigan was, in fact, already at home by that time. Does it show that he was at home at that time? At 2.30 was the testimony. His testimony and his sister's. That he went home earlier, but is it clear where he was at that moment? At 3 a.m.? Right. Yes, he was at home with his sister. According to him? His sister and Jernigan. Okay. So either the Lennons heard night moving around at 3 o'clock in the morning. Is it possible that the jury could have disbelieved Jernigan? I'm sure it is possible that they could have believed Jernigan. But there are other factors which suggest that, in fact, it was someone else besides Jernigan who killed Mr. Knight. There was not just his testimony, though. His sister also testified that when she went back over to the room, she heard noises. And, of course, when she got home, Jernigan was already there, which corroborates his testimony. Counsel, I guess I'm sorry. Could you just help me understand where you're going with this? He was convicted. This is a habeas case, is it not? Yes. So we have to be able to say that some ruling of the State court went way, way wrong, not that the jury should have reached a different decision or that there was something that was unreasonable that was held by the State courts. Where are we going? Well, no. There was a finding that there was a constitutional violation. What this Court has to determine is whether under Brecht that violation had a substantial and injurious effect on the jury's verdict. So that's where I'm going.   to determine, and there was anything to be determined by this Court, is not looking at AEDPA's contrary to your unreasonable, is whether, in fact, that error had a substantial and injurious effect on the jury. Counsel, you said that the evidence was not overwhelming, but that was a finding by the Nevada Supreme Court is that the evidence was overwhelming. Right. Including that he had confessed to a friend that he had slid his throat with a machete. Right. Earlier he was going to go meet with him and basically take care of him. He had a grudge against him, apparently. Well, that was what some of the evidence was. There's also evidence that suggests that wasn't true. But if there's evidence in the record that he told a friend that he had slit the victim's throat with a machete and we know that he was in the room and that's not disputed, your client doesn't dispute that he wasn't in the room and that he hadn't beat him. Right. He just said he didn't kill him. Right. Then what are we supposed to do with the Nevada Supreme Court's finding that the evidence was overwhelming? That wouldn't be subject to the Brecht standard. That is likely going to have to be we're going to have to find that that is an unreasonable finding of fact. I disagree. I think that pursuant to Fry v. Plyler, the only thing that this Court is to determine is whether the – if there's a finding that there was a constitutional violation and we have, both from the Nevada Supreme Court and the district court, then the only thing for this Court to consider is not whether the Nevada Supreme Court's decision as to harmlessness was unreasonable or contrary to, but whether under Brecht the violation – The constitutional violation being what? The prosecutorial misconduct violation. The Darden v. Wainwright prosecutorial misconduct violation. So the – Some of which was the trial judge admonished the jury not to consider. There was only one curative instruction that the trial court gave, and that was with respect to the drug use, I believe. But also the general instruction, I think, was given that arguments of counsel are not evidence. So they had that. We do have that. But we also have repeated and pervasive references to Mr. Jernigan's character and his prison status throughout the trial, and as I was going through earlier, compelling factors would suggest that the evidence was not overwhelming, even with the statement from Ms. Brown and Ahart that he confessed to them. The evidence I'm talking about suggests that those witnesses' testimony wasn't credible. So we have an additional factor was that Jernigan had no access to a machete. The assumption was that it was Knight's own machete. But we know that Jernigan didn't live in MENA. He hadn't associated with Knight for some time. He couldn't have known that Knight had a machete. Knight's throat was slashed, right? I'm sorry? Was Knight's throat slashed? Yes. It was more of a thrust into the neck. So there was no ---- Murder weapon ever found? The machete was found underneath Mr. Knight's body. So we actually have a machete present, and Brown says, Yes. Jernigan told me he slit Knight's throat with the machete. Right. And what I'm attempting to explain to the Court is that couldn't possibly have been because Jernigan knew there was a machete in Mr. Knight's room because he hadn't associated with Mr. Knight. There was no testimony that Mr. Knight was ever to have been in possession of a machete. The evidence was that he owned a gun. How would he have known that there would have been a machete found if ---- why would he have even made reference to machete if he didn't ---- wasn't there? Well, that's precisely what I think. I think he never said it. Ms. Brown's statement is a figment of her own imagination or something that the Court fed her. The evidence ---- This is the sufficiency of the evidence. This ---- well, I'm trying to go through the evidence to explain why it wasn't overwhelming and why the prosecutorial misconduct, in fact, did have a substantial injurious effect on the jury's verdict. And one of those factors is that he ---- Jernigan didn't bring the machete with him. The room wasn't ransacked for somebody looking for Mr. Knight's machete. The testimony was that the folks in the room on that evening didn't see a machete out in the open. So the statement that he killed ---- killed him with his own machete doesn't make any sense unless Jernigan knew where the machete was, and we know that couldn't have been true. Unless he killed him with a machete. If he knew there was ---- that Knight owned a machete and he knew where it was in the hotel room. And there was nobody else in the room with him at the time, right? Not at the time, but there were ---- there were ---- Did Knight pull the machete out from under the bed? We don't know this. Well, we don't know that, but we do have the evidence that Jernigan told Brown, the woman who was with him who was sympathetic to him, at least at some point in their relationship, that he told her that he had slit Knight's throat with a machete. But how would Knight know that the machete ---- how would Jernigan know there was a machete under the bed? He would have had to have looked. I don't know, but that's what Jernigan said, and the jury is entitled to believe that. Yes. But the jury also heard all of the prosecution's comments and references to his bad character. And there are other factors which suggest that it wasn't Jernigan. The noises in the room after he was already home is one factor. The fact that he couldn't have had access to the machete, would have had to go looking for it and move things around in the room, and there's no evidence of that. There's the fact that the ---- that the injuries were to the left side of Mr. Knight's neck, and Jernigan is left-handed, and the State argued that he stood over ---- that Jernigan stood over him and thrust the knife in his neck, but the injuries would be on the right side. In short, there are many factors which suggest that the evidence was not overwhelming and that the State ---- Yeah. That the prosecution's misconduct affected the verdict. But I want to make sure that we're on the same wavelength here. We do not have a constitutional violation in this case unless the misconduct was such that it would have affected the result. We have prosecutorial misconduct, but that in and of itself is not a constitutional violation. Well, I think that the ---- I think I would argue that the Nevada Supreme Court and the district court found that it was. And that's why we're at the ---- It found that the evidence was overwhelming. No. They found that the prosecutor committed misconduct. Yes. That in and of itself is not a violation of the Constitution. Well, I'm arguing that in this case it was. Yes. I understand. Interesting, the materials that were submitted that you thought were improper and that were improper, some of the things that the prosecutor said, didn't go to propensity for violence, though. They went to things like he had tattoos, he didn't support his child, et cetera, et cetera. That was the kind of the nature of things. Yes. The prosecutor wasn't saying he has a history of violence, he's a dangerous person, he's got a terrible temper. It was that he's not taking care of his child and he's got tattoos and he's a druggie. Swastika tattoos. Well, right. Yes. But the uncertified issue, there are several, and I think the district court counted to 10 or 11 references to his prior prison status. So there was some indication or injection of testimony that he was, in fact, a bad character who committed crimes. Okay. Mr. Woodrum. Good morning, Your Honors. May it please the Court. Adam Woodrum with the Attorney General's Office on behalf of the Board. The evidence, as you pointed out, was overwhelming. The Nevada Supreme Court said it was overwhelming. They also said that there was strong, direct, ample, and non-circumstantial evidence. The question of guilt was not close, but the State presented a strong case. There is ample speculation in Mr. Jernigan's briefing. First of all, what I'd like to put to bed is the issue that Mr. Jernigan or that the murder occurred at a certain time or that Mr. Jernigan was home before the murder occurred. Even as Mr. Jernigan points out in his, I believe, reply brief, Mr. Boyer, who was the hotel manager, said that this family checked in at about 1 o'clock in the morning. So it's very possible that the sounds they heard were not at 2.30 or 3 o'clock in the morning. I'd also like to point out in regards to that particular point of fact that it was introduced by stipulation at the record in 527 and that there's no time listed in the stipulation. So obviously, this was an issue that was at issue. If there was no issue as to when these folks, this family, checked into the motel, I assume that would have been in the stipulation. But again, I'm just speculating now. The appellant says that, makes several sort of factual allegations. In terms of the machete specifically, Mr. ---- the victim, Mr. Knight, was, as they say, a known drug dealer, a known gun dealer. This is at least the allegation. And I'd ---- Were there any fingerprints on the machete? I don't know that the machete was checked for fingerprints. So none that we know about. There were three fingerprints at issue. Two were Mr. Jernigan's. One was unidentifiable. Oh, I'm sorry. I'm sorry. Let me take that back. Two of them was Mr. Knight's, the victim. One of them was unidentifiable. So, no, Mr. Jernigan's fingerprints were not found on the machete. They were not tested. No. No. I don't believe that it was. I think the record indicated there was ---- it wasn't tested. I believe that's true, yes. The thing is, is that a majority of the factual basis that appellants rely on is Mr. Jernigan's own testimony. And that is the province of the jury, if they so choose, to disregard that testimony. His testimony is incredible. It is he lies to police when he's confronted. He tries to create an alibi in Sylvia Brown. He tries to create another alibi by having his sister say there was a blue truck at the scene or something. I don't have it at the tip of my tongue, unfortunately. And then he destroys evidence. He goes and he washes his jeans. Now, Mr. Jernigan says there's no evidence that he washed his jeans or that he didn't wash his jeans, but there's no citation to the record for that point. So as far as we know, that washing machine had his dirty clothes in it. Again, this is speculation. What we do know is that the victim's blood was on his boots. This goes back to the fact that he makes up this story about, well, I went over there and I hit him, and he fell on the ground, and he was trying to ---- he was grasping at my boots as to say, enough's enough, don't hit me anymore, et cetera. But again, this is a story he creates after he's questioned, after he's arrested. He doesn't come out and say, yeah, I hit him. He comes out and says, I killed him, to Sylvia Brown. He not only confesses to her, but he confesses to another individual on another day, which is Ahart, Don Ahart. So he's confessed the murder, including the means of the murder, to two individuals on two separate occasions. This evidence is absolutely overwhelming. Are there any questions? I don't think there are any for the questions, counsel. Thank you. Thank you. Ms. Bookhofer, we took your time, but I'm going to allow you a minute. Just to be very brief. Judge Schroeder, I wanted to address your questioning of me before. I am of the opinion that the Nevada Supreme Court and the district court found that there was a due process violation, a constitutional violation. So in Maralillo ---- I forget the name of the Maralillo case. Maralillo v. Yates, this Court held, we reaffirmed that under Frye we need not conduct an analysis under AEDPA of whether the State court's harmlessness determination on direct review was contrary to or an unreasonable application of clearly established Federal law, which is why I am presenting to this Court that if we have the due process violation, which I believe that the Court found, then the only issue to be determined is whether that had a substantial injuries effect on the jury's verdict.  Thank you. Thank you. The next case on the calendar is Maharaj v. Holder.
judges: Beistline, Schroeder, Bybee